UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____ )
                                    )
CAROLYN RUTH FOX,                   )
                                    )
        Plaintiff,                  )
                                    )
    v.                              )  Civil Action No. 03-2369 (RBW)
                                    )
ANDREW A. GIACCIA, <u>et al.</u>,       )
                                    )
        Defendants.                 )
_____ )

<u>MEMORANDUM OPINION</u>

This employment discrimination case arises from the termination of the plaintiff's

employment in January 2003.  Defendant Chadbourne & Parke LLP's Statement of Facts as to

Which There is No Genuine Issue (Def's Facts") ¶¶ 1, 112.  This action was brought initially

against the law firm where the plaintiff had been employed, Chadbourne & Parke, LLP, and

individual employees of the firm.  In a previous ruling, the Court dismissed the individual

defendants and all claims against the law firm except those brought under Title VII of the Civil

Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq*. (2000), 42 U.S.C. § 1981 (2000), and the District

of Columbia Human Rights Act ("DCHRA"), D.C. Code §§ 2-1401.1 -1403.17 (2001).  *See*

Memorandum Opinion and Order (July 26, 2004).  The defendant law firm now moves for

summary judgment on these remaining claims.  Upon consideration of the motion, the

plaintiff's opposition, the defendant's reply, and the entire record, the Court will grant the

defendant's motion and dismiss this case.

## I.  BACKGROUND[1]

It is undisputed that the defendant hired the plaintiff in September 1997 as a word processing operator in its Washington, D.C. office.  Def.'s Facts ¶ 2.  Her duties included using computer software, printing documents, transcribing tape recordings, and related duties. *Id*. ¶ 4.  The plaintiff worked the evening shift from 6 p.m. to 2 a.m., often as the sole assistant to attorneys working during the evening hours.  *Id*. ¶¶ 1-4.  The plaintiff was supervised by Alicia Leach (now Jones) until April 2002.  *Id*. ¶¶ 20-21.  Thereafter, she was supervised by Office Manager Florence Neuland until her termination.  *Id*. ¶ 21.  Ms. Neuland reported to the firm's managing partner, Andrew Giaccia.  *Id*. ¶ 22.  On March 27, 2002, the plaintiff sent an e-mail to Ms. Leach informing her that she intended to file harassment charges and wanted the charges investigated.  *Id*. ¶ 42.  On that same day, the plaintiff lodged a formal complaint of harassment against Ms. Leach with the firm's ombudsman, Stephen Buchman. *Id*. ¶ 43.  Ms. Leach forwarded the e-mail she had received to Mr. Giaccia who, in turn, forwarded the e-mail to the firm's in-house employment counsel, Peter Hillman.  *Id*. ¶¶ 45-46. Mr. Giaccia forwarded the e-mail to Mr. Hillman because he surmised that the harassment charge would involve the firm's Workplace Issues Committee on which Mr. Hillman served. *Id*. ¶ 47.  Mr. Giaccia also forwarded the e-mail to Mr. Hillman because he had told Hillman earlier that he wanted to talk to him about terminating an employee.  *Id*. ¶ 48.  During a telephone conversation on the evening of March 27, 2002, Mr. Hillman informed Mr. Giaccia

---

[1]    The facts as set forth in this section of the opinion are undisputed by the plaintiff unless otherwise indicated.  *See* Plaintiff Carolyn R. Fox's Response to Chadbourne's "Statement of Material Facts as to Which There is No Dispute."

that the plaintiff's complaint did not require an investigation by the firm's Workplace Issues
Committee because it was a charge of harassment against a supervisor of the same race
(African American). ¶¶ 49-50.  The following day, Mr. Giaccia forwarded the complaint of
"'harassment'" to Mr. Buchman "to help mediate the interpersonal dispute between Ms. Fox
and Ms. Leach."  *Id.* ¶ 51.

Giaccia and Hillman continued to discuss the plaintiff's employment status over the
next several weeks following the receipt of the plaintiff's March 27 e-mail.  *Id.* ¶ 52.  Because
the plaintiff's personnel file contained no documentation of complaints Mr. Giaccia had
received either verbally or through e-mail, Mr. Hillman advised Mr. Giaccia to begin
documenting the plaintiff's performance problems  beginning with two incidents that had
occurred in March 2002.  *Id.* ¶¶ 53-54.  On April 2, 2002, in response to instructions from
Mr. Giaccia, Ms. Leach drafted two memoranda that outlined the two events.  *Id.* ¶¶ 55-56.  In
one of the memoranda, Ms. Leach recommended the plaintiff's termination.  *Id.* ¶ 56.  Instead,
Mr. Giaccia removed Ms. Leach from her supervisory position and assigned Ms. Neuland as
the supervisor of the word-processing department.  *Id.* ¶ 57.

Meanwhile, on April 1, 2002, the plaintiff requested by e-mail that Mr. Buchman
mediate conflicts the word-processing operators had been having with Ms. Leach.  *Id.* ¶ 59.
In a memorandum to Mr. Buchman dated April 6, 2002, the plaintiff expressed her concerns
about the word-processing department that she wanted to discuss at the mediation session.  *Id.*
¶ 60.  She followed this communication with a list of topics by e-mail dated April 10, 2002.
*Id.* ¶¶ 59-60.  Concerns about race were not on the list.  *Id.* ¶ 64; Defendant's Exhibit ("Def.'s
Ex.") 29.  Mr. Buchman then met with the plaintiff and two other word-processing operators,

both African American, on April 15, 2002.  Def.'s Facts ¶ 65.  The operators gave Mr.

Buchman permission to speak with their supervisors, and later that same day, Mr. Buchman

met with Mr. Giaccia to discuss his meeting with the operators.  *Id.* ¶¶ 74-75.  They discussed

the operators' complaints about how the word-processing department was managed but neither

recalls discussing racial issues.  *Id.* ¶¶ 76, 78-79.

     Thereafter, attorneys at the firm continued to complain about the plaintiff's work, with

complaints being made on or about June 18, 2002, August 9, 2002, September 10, 2002, and

September 30, 2002.  *Id.* ¶¶ 83-86.  They identified a number of errors in her work and her

seeming lack of knowledge about certain computer functions.  *Id.* ¶¶ 83-86.  On September 18,

2002, Mr. Giaccia and Ms. Neuland consulted with the plaintiff about her performance

problems and to determine if she needed to be accommodated for an eye condition.  *Id.* ¶ 89.

The plaintiff acknowledged her difficulties but also conveyed her belief that she was being

blamed for things that were not her fault.  *Id.* ¶¶ 90-91.  The plaintiff also indicated that her

eye problem was being aggravated by the air flowing from a vent over her desk.  *Id.* ¶ 91.

The air flow was redirected.  *Id.* ¶ 92.

     In a written evaluation dated November 7, 2002, Ms. Neuland rated the plaintiff's

overall performance as a "2" or "Below Average"  *Id.* ¶ 95.  She also rated the plaintiff below

average in specific skill categories, including word processing.  *Id.*  On December 3, 2002,

Ms. Neuland forwarded recommended salary increases for 2003 to the firm's human resources

director. *Id.* ¶ 98.  She did not recommend the plaintiff for a salary increase because it had

been decided that the plaintiff would be terminated.  *Id.* ¶¶ 97-99.  However, the plaintiff was

not terminated due to the upcoming holiday season.  *Id.* ¶ 100.  Meanwhile, attorneys

continued to complain about the plaintiff's work product and expressed their lack of

confidence in her work.  *Id.* ¶¶ 101-02.  Around January 13, 2003, a partner met with Mr.

Giaccia to inform him that he had used paralegals and associates to type a major brief rather

than have the plaintiff do the typing because "he could not risk having the document

disappear, malfunction, or contain typos or other unanticipated changes."  *Id.* ¶ 102.

On January 16, 2003, the plaintiff submitted a memorandum entitled "Formal

Complaint of Harassment and the Evaluation Process" to the human resources director,

wherein she surmised that her failure to receive a raise was an indication that she was going to

be terminated.  *Id.* ¶ 103.  The plaintiff sent a copy of the complaint to Mr. Buchman and Ms.

Neuland.  *Id.*  Ms. Neuland sent a copy of the complaint to Mr. Giaccia, who, in turn, sent a

copy to Mr. Hillman and the firm's managing director, Aniello Bianco.  *Id.* ¶¶ 105-06.  Mr.

Giaccia informed Mr Bianco about the plaintiff's performance problems and the fact that "we

have been considering her termination for more than a year."  *Id.* ¶ 106.  Eventually, during a

meeting with Mr. Giaccia and Ms. Neuland on January 22, 2003, the plaintiff was told she

was being terminated.  *Id.* ¶ 112.

The plaintiff then filed a complaint with the Equal Employment Opportunity

Commission ("EEOC") on April 8, 2003.  *Id.* ¶ 114.  The EEOC responded to the complaint

by issuing a "Dismissal and Notice of Rights" form on May 20, 2003.  *Id.* ¶ 115.  The

plaintiff initiated this action on November 14, 2003.  She alleges that the defendant

discriminated against her based on her race and retaliated against her for speaking out about

racial discrimination at the firm.

As grounds for its summary judgment motion, the defendant asserts that the plaintiff's

Title VII claim is untimely.  Defendant Chadbourne & Parke LLP's Motion for Summary

Judgment at 1.  In addition, the defendant asserts that the plaintiff cannot establish a *prima*

*facie* case of race discrimination or retaliation. *Id*. at 1-2. Nor, it contends, can she rebut the defendant's legitimate, non-discriminatory reasons for her termination. *Id*.

## II. STANDARD OF REVIEW

Courts will grant a motion for summary judgment under Rule 56(c) if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When ruling on a summary judgment motion, courts must draw "all justifiable inferences" in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Courts "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). However, a plaintiff must establish more than "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position," *Anderson*, 477 U.S. at 252, and "*some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id*. at 247-48 (emphasis in original).

A "genuine" dispute exists "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Morgan v. Fed. Home Loan Mortg. Corp.*, 328 F.3d 647, 650 (D.C. Cir. 2003) (quoting *Anderson*, 477 U.S. at 248). "If the evidence is merely colorable … or is not significantly probative … summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted). Therefore, the party opposing summary judgment "'may not rest upon the mere allegations or denials of [the] pleadings, but

… must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 248 (quoting *First Nat'l Bank of Ariz. v. Cities Service Co.*, 391 U.S. 253, 288 (1968)) (quoting Fed. R. Civ. P. 56(e)).  Under Rule 56(c), if "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," summary judgment is warranted.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

III.  DISCUSSION

A.  <u>The Timeliness of the Title VII Claim</u>[2]

A Title VII claimant has 90 days from the receipt of an EEOC right-to-sue notice, or after receipt of a notice of final action taken by the EEOC on appeal of an agency decision, to file a civil action.  *See* 42 U.S.C. § 2000e-5(f)(1).  It is presumed that the right-to-sue letter or other notice of the EEOC's final action was mailed on the same date of its issuance, *see Anderson v. Local 201 Reinforcing Rodmen*, 886 F. Supp. 94, 97 (D.D.C. 1995), and received three days after it was mailed.  *See Baldwin County Welcome Ctr. v. Brown*, 466 U.S. 147, 148 n. 1 (1984) (applying Fed. R. Civ. P. 6(e) to Title VII cases).

The 90-day requirement for filing a civil action is subject to waiver, estoppel, and equitable tolling.  *See Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982).  The "hurdle" for equitable tolling, however, is high.  *Communications Vending Corp. of Arizona, Inc. v. F.C.C.,* 365 F.3d 1064, 1075 (D.C. Cir. 2004) (citation omitted).  "The court's equitable power to toll the statute of limitations will be exercised only in extraordinary and carefully

---

[2]  Title VII prohibits discrimination in employment based on "race, color, religion, sex, or national origin,"  42 U.S.C. § 2000e-2(a)(1), and retaliation against an employee who has "opposed any practice made an unlawful employment practice."  42 U.S.C. § 2000e-3(a).

circumscribed instances." *Mondy v. Secretary of the Army*, 845 F.2d 1051, 1057 (D.C. Cir. 1988).  "[I]n the absence of some equitable tolling, a civil suit filed even one day late is barred and may be dismissed."  *Burgh v. Borough Council of Borough of Montrose*, 251 F.3d 465, 470 (3d Cir. 2001).  The defendant has the burden of proving that an action is untimely and, once the defendant satisfies that burden, the burden shifts to the plaintiff to assert that equitable principles justify avoidance of the defense.  *See Bowden* v. U.S., 106 F.3d 533, 437 (D.C. Cir.  1997).

It is undisputed that the EEOC issued its right-to-sue notice on May 20, 2003.  *See* Def.'s Ex. 54.  The notice and cover letter each informed the plaintiff about the 90-day filing requirement.  Def.'s Exs. 54-55.  The EEO complaint process report indicates that the notice was mailed on May 20, 2003, to the plaintiff's address at that time.  Def.'s Ex. 56.  As noted, this action was not filed until November 14, 2003, well past the 90-day filing period.  However, the plaintiff testified during her deposition that she did not receive the notice.  Def.'s Ex. 1 (Fox Deposition ("Fox Dep.")) at 146.  This assertion alone does not satisfy her burden.  *See Griffin v. Acacia Life Ins. Co.*, 151 F. Supp.2d 78, 81 (D.D.C.2001) (Title VII claims deemed untimely due to plaintiff's failure to provide sufficient evidence rebutting presumption of receipt of right-to-sue notice three days after it was mailed).  The plaintiff offers neither an explanation nor any evidence to rebut the presumption that she received the decision three days after it was mailed. The plaintiff therefore has not established the existence of a genuine issue of material fact as to the date on which the law presumes she received the decision.  Given what the defendant has offered, and the plaintiff's failure to articulate an equitable basis for tolling the 90-day filing period, the Court concludes that the filing of the Title VII claim is untimely.  *See Griffin*, 151 F. at 81.  The Court will therefore grant the defendant's motion for summary judgment with respect to the claims of discrimination and retaliation brought under Title VII.

B.  The Section 1981 and DCHRA Claims

*1.  The Plaintiff's Discrimination Claims*

The plaintiff invokes 42 U.S.C. § 1981, which in relevant part, provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

*Id*.  "The legal standards applicable to race discrimination are the same under the DCHRA and

§ 1981."  *Beckwith v. Career Blazers Learning Center of Washington, D.C., Inc*.  946 F. Supp.

1035, 1048 (D.D.C. 1996) (citation omitted).  A race discrimination claim under § 1981 requires

proof of intentional discrimination.  *See Gen. Bldg. Contractors Ass'n. v. Pennsylvania*, 458 U.S.

375, 391 (1982).  Discriminatory animus may obviously be shown through direct evidence.  In

the absence of direct evidence of discrimination, which is the case here, a claim of discrimination

is analyzed under the familiar burden-shifting test articulated in the seminal case of *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792, 793 (1973).  *Morgan v. Fed. Home Loan Mortgage*

*Corp*., 328 F.3d 647, 650 (D.C. Cir. 2003) (citing *Carter v. Duncan-Huggins, Ltd.*, 727 F.2d

1225, 1232 (D.C. Cir. 1984)) (applying the *McDonnell Douglas* framework to § 1981 claims).

To establish a *prima facie* case in the absence of direct evidence of discrimination, the plaintiff

must demonstrate "that: '(1) she is a member of a protected class; (2) she suffered an adverse

employment action; and (3) the unfavorable action gives rise to an inference of discrimination.' "

*Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002) (quoting *Brown v. Brody*, 199 F.3d 446, 452

(D.C. Cir. 1999)).  The third element may be satisfied "by demonstrating that [the plaintiff] was

treated differently from similarly situated employees who are not part of the protected class" or

by "showing that the discharge was not attributable to the two [] common legitimate reasons for discharge: performance below the employer's legitimate expectations or the elimination of the plaintiff's position altogether." *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005) (citations omitted).   If the plaintiff is able to establish her *prima facie* case by a preponderance of the evidence, the burden of production switches to the employer to "articulate a legitimate, nondiscriminatory reason for its actions." *Stella,* 284 F.3d at 144 (citing *McDonnell Douglas*, 411 U.S. at 802).  If the employer is able to satisfy this burden of production, "it [effectively] rebuts the plaintiff's *prima facie* case, and the presumption of discrimination created by the *prima facie* case 'drops out of the picture.' " *Teneyck v. Omni Shoreham Hotel*, 254 F. Supp.2d 17, 20-21 n. 3 (D.D.C. 2003) (quoting *Dunaway v. Int'l Bhd. of Teamsters*, 310 F.3d 758, 762 (D.C. Cir.2002) (citation omitted)).  "The plaintiff must then demonstrate that the employer's stated reason was pretextual and that the true reason was discriminatory." *Stella*, 284 F.3d at 144 (citing *McDonnell Douglas*, 411 U.S. at 804; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507-08 (1993)).

The defendant challenges the plaintiff's satisfaction of the third element of the *prima facie* case equation, *i.e.*, the inference of discrimination.  The plaintiff's evidence on this point consists of her deposition testimony and the declarations of two former and two current employees stating their general belief that white employees were treated better than black employees in the firm's Washington, D.C. office in such areas as work hours, pay, and promotion.  *See* Plaintiff Carolyn R. Fox's Memorandum of Points and Authorities in Opposition to Defendant Chadbourne & Parke LLP's Motion for Summary Judgment ("Pl.'s Opp.'n") at 33.  As specific examples, the plaintiff testified, without any corroboration, that a former white word processor was allowed to leave work "regardless of the projects that may not have been

10

finished," while she was 'harassed' . . . about overtime and expected [] to stay and finish projects." *Id*. at 10. She also asserts that the defendant made "'allowances' for a white legal secretary of the same age as [the plaintiff] . . . when [she] complained that her hands hurt," but "would not listen to [the plaintiff] when she raised the same issue." *Id*. To defeat this summary judgment motion, the plaintiff must offer something "beyond her own speculations and allegations." *Brown v. Brody,* 199 F.3d 446, 458 (D.C. Cir. 1999). Her witnesses fare no better. They also testified, without any supporting evidence, about perceived disparate treatment. For example, legal secretary Barbara Adams averred that "African-American staff are being paid less than white staff even though they have similar experience." Plaintiff's Exhibit ("Pl.'s Ex.") 25 (Declaration of Barbara A. Adams ("Adams Decl.") ¶ 4. Ina Lucas, a former employee of the word-processing department, averred similarly that "I remember hearing of incidents where white employees were paid more than black employees for doing similar jobs." Pl's Ex. 14 (Declaration of Ina V. Lucas ("Lucas Decl.")) ¶ 8. On summary judgment, "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e). Neither declarant has provided a factual basis for their conclusions, nor is it clear from the declarants' respective job titles or descriptions how they would be aware of such information. In addition, Ms. Adams attributes her negative job reviews, which was not the case when she worked in the New York office, "to the way in which African-America staff members are treated in the [firm's] Washington, D.C. office." Adams Decl. ¶ 5. And Ms. Lucas "analogized Chadbourne to a 'plantation' whose culture was to 'hold the black people down.'" Pl.'s Opp.'n at 11 (citing Lucas Decl. ¶ 6, 9). Such speculative testimony is not significantly probative of whether discrimination may be inferred because, as the defendant counters, the "[p]laintiff does not identify even one similarly situated person outside the

protected class who had the same performance problems she did, and who was not terminated."
Reply Memorandum of Defendant Chadbourne & Parke LLP to Plaintiff's Opposition to Motion
for Summary Judgment ("Def.'s Reply") at 11; *see George*, 407 F.3d at 412 ("[o]ne method by
which a plaintiff can satisfy the third prong . . . is by demonstrating that she was treated
differently from similarly situated employees who are not part of the protected class."); *Hopkins
v. Women's Div., General Bd. of Global Ministries,* 284 F. Supp.2d 15, 28 (D.D.C. 2003)
(Walton, J.) (quoting *Waterhouse v. District of Columbia*, 298 F.3d 989, 995-96 (D.C. Cir.2002))
( "without [] evidence that the 'comparators were actually similarly situated to her,' . . . the
plaintiff's claim must fail.  Moreover, these inadmissible hearsay statements could not be used by
the plaintiff to establish that she was the victim of disparate treatment discrimination.").

"[A]nother way to satisfy [the] third prong is . . . [by] showing that the discharge was not
attributable to the two [] common legitimate reasons for discharge:  performance below the
employer's legitimate expectations or the elimination of the plaintiff's position altogether."
*George*, 407 F.3d at 412 (citation omitted).  Here, the plaintiff was terminated for her
unsatisfactory job performance, which was documented over nine months prior to her
termination.  *See* Def.'s Facts ¶¶ 40-41, 55-56, 83-86, 94, 95, 101-02.  The plaintiff's evidence
showing that she had received favorable job reviews and salary increases during the first four
years of her employment, Plaintiff Carolyn R. Fox's Local Rule 56.1 Statement of Additional
Material Facts ("Pl.'s Add'l Facts") ¶¶ 13-32, is not probative of her performance during the
crucial nine month time period leading up to her termination.  This is particularly so where it is
documented that the plaintiff's job performance reportedly began to decline in 2000 and "[b]y
[the] first quarter of 2002, [her] attitude had grown volatile and defensive" to the point that

former supervisor Leach (Jones) had recommended the plaintiff's termination.  Def.'s Ex. 49.[3]

*See Evans v. Davis Memorial Goodwill Industries*, 133 F. Supp.2d 24, 29-30 (D.D.C. 2000)

(summary judgment granted to employer where evidence demonstrated "that Goodwill officials

were unhappy with plaintiff's writing efforts [,] had in fact received complaints about letters he

wrote, [management was frustrated with errors] and . . . the level of concern about plaintiff's

performance prompted an evaluation mid-way through his probationary period at which

defendant specified problems with plaintiff's writing and his ability to accept direction with

regard to his writing."); *Marshall v. Shalala*,  16 F. Supp.2d 16 , 22 -23 (D.D.C.1998) (summary

judgment granted to employer where evidence showed deterioration in job performance between

1994 and 1996).  Thus, even if the plaintiff had established a *prima facie* case, she has "offered

no grounds for a rational juror to conclude that the reason she was fired was racial discrimination

rather than poor performance."  *Waterhouse*, 298 F.3d at 995.  She therefore has not rebutted the

defendant's demonstration of a legitimate, nondiscriminatory reason for her discharge based on

her unsatisfactory job performance.

On the record before the Court, the plaintiff has failed to raise a genuine issue of material

fact as to her disparate treatment claim.  The defendant's motion for summary judgment on the

discrimination claims brought under 42 U.S.C. § 1981 and the DCHRA therefore is granted.

### 2.  The Plaintiff's Retaliation Claim

To the extent that the plaintiff is claiming retaliation under the DCHRA, she must

establish  "(1) that she engaged in statutorily protected activity, (2) that the employer took an

_____

[3]  "When this didn't happen immediately, [Leach] asked to be removed as [plaintiff's]
supervisor, for health reasons," *id*., and her request was granted. Def.'s Ex 2 (Deposition of
Andrew Giacci ("Giacci Dep.")) at 25-26.

adverse personnel action; and (3) that a causal connection existed between the two." *Mitchell v. Baldridge*, 759 F.2d 80, 86 (D.C. Cir. 1985). "The causal connection component . . . may be established by showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity." *Id* & n.6 (citations omitted). The plaintiff identifies the protected activity as her meeting with Ombuds Buchman in April 2002. However, she has failed to satisfy the third element of the prima facie case for the following reasons.

First, it is undisputed that Mr. Giaccia was solely responsible for the termination decision. Giaccia Dep. at 67. It is also undisputed that Mr. Giaccia had considered terminating the plaintiff for "bad performance" as early as 2001, Giaccia Dep. at 49, based on his "considerable personal experience . . . with Ms. Fox's errors [,] her insubordinate actions with Ms. Leach," *id*. at 52, and his knowledge gained from the complaints he received from other attorneys about the plaintiff's work. *Id*. at 52-56. On March 27, 2002, weeks before the meeting with Mr. Buchman, Mr. Giaccia had "got the wheels in motion," *id* at 49, to terminate plaintiff by seeking formal advice from Mr. Hillman. *Id*. at 81. Employers are not obliged to suspend "*previously contemplated*, though not yet definitively determined" actions in the wake of an employee's exercise of protected activity. *Clark County School District v. Breeden*, 532 U.S. 268, 272 (2001) (emphasis added).

Second, accepting as true the plaintiff's claim that race was discussed during the meeting, the plaintiff does not refute the defendant's evidence establishing that Mr. Giaccia was unaware of the plaintiff's alleged complaints of race discrimination at any time before the initiation of this litigation. Giaccia Dep. at 58-63. From all accounts of the meeting with Mr. Buchman, the discussion focused mainly on the management and operations of the word-processing

14

department.  If race was mentioned, it was not dwelled upon because "[w]e wanted to focus on

the merits of our problems because people have a tendency to shut down when you talk about

race."  Def.'s Ex. 7 (Deposition of Bolade Rasul) at 212; *see also* Defendant Chadbourne &

Parke LLP's Responses to Plaintiff's Statement of Additional Material Facts ¶ 49.  The plaintiff

identifies her memorandum to Mr. Buchman dated April 6, 2002, nearly a week before the

meeting, as evidence of her alleged protected activity.  In her memorandum, she had reminded

Mr. Buchman of a discussion they had during a "harassment meeting" three years earlier.   Def.'s

Ex. 28; Pl.'s Ex. 20 ("Memorandum").  The plaintiff noted that in response to his question

whether her problems she was having at that time were attributed to her race, she responded that

"race is always a factor, however, the major problem was management and the blatant misuse of

power."  Memorandum at 1.  The plaintiff then proceeds to discuss the non-race related issues

and concluded the memorandum with her belief that the attorneys' reactions to black employees

"[have] a lot to do with the race factor.  Blacks are stereotyped . . . as having 'attitudes or being

arrogant.'  No one ever looks at the fact that Blacks for the most part have to be twice as good and

tolerant of having your back broke, while the expectations of other cultures is not so stringent."

Memorandum at 5.  In her deposition, the plaintiff admits that this was not a specific complaint

of race discrimination but was rather an observation about race "as a cultural issue" in the United

States.  Def.'s Ex. 1 (Deposition of Carolyn R. Fox) at 340.  The memorandum clearly does not

amount to protected activity.  *See Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006)

("While no 'magic words' are required, the complaint must allege unlawful discrimination, not

just frustrated ambition.") (citing cases).  However, even if the plaintiff had engaged in protected

activity, she  cannot establish her *prima facie* case where, as here, "the record indicates that the

15

selecting official was unaware of the plaintiff's prior protected activity" when he made the adverse employment decision. *Buggs v. Powell*, 293 F. Supp.2d 135, 1150 (D.D.C. 2003).

Third, the temporal proximity between the purported statutorily protected activity and the adverse action must be "very close" to establish a causal connection between the two events. *Hammond v. Chao*, 383 F. Supp.2d 47, 59 (D.D.C. 2005) (quoting *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)).  For example, "courts generally have accepted [as a causally sufficient] time [,] periods of a few days up to a few months and seldom have accepted time lapses outside of a year in length." *Davis v. Ashcroft*, 355 F. Supp.2d 330, 352 (D.D.C. 2005) (quoting *Brodetski v. Duffey*, 141 F. Supp.2d 35, 43 (D.D.C. 2001)).  Here, the nine-month time span between the plaintiff's meeting and her termination, without additional evidence, is too great to find temporal proximity. *See Buggs*, 293 F. Supp.2d at 148 (seventh-month time span between the protected activity and the adverse action "is not, *by itself*, sufficient to establish an inference of discrimination") (emphasis in original).  Accordingly, the Court concludes that no reasonable juror could find for the plaintiff on the record in this case.  The defendant's motion for summary judgment on the retaliation claim therefore is granted.

## IV.  CONCLUSION

For the preceding reasons, the Court concludes that the record presents no triable issues on either the plaintiff's discrimination or retaliation claims and that the defendant is entitled to judgment as a matter of law.[4]

_____s/_____
Reggie B. Walton
United States District Judge

Date: March 23, 2006

_____

[4]   A separate Order of dismissal was entered on March 22, 2006.   The Court extends its appreciation to the law firm of Howrey Simon Arnold & White, LLP, for the exemplary *pro bono* representation it provided to the plaintiff.